UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

IVONNE IRIZARRY VALENCIA,

                          Plaintiff,

                                                                   **REPORT AND RECOMMENDATION**

v.                                                            15-CV-965(RJA)(JJM)

NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,
                                Defendant.
_____

## INTRODUCTION

Before the court are the parties' cross-motions for judgement on the pleadings [9, 12][2] which were referred to me for preparation of a Report and Recommendation [10]. For the reasons stated below, I recommend that this case be remanded for further administrative proceedings.

## BACKGROUND

Plaintiff filed an application for Social Security Disability ("SSD") benefits[3] on August 12, 2012 (T. 67, 129-37).[4] She claims she became disabled on November 1, 2010 due to

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] Bracketed references are to the CM/ECF docket entries.

[3] The record does not reflect that plaintiff applied for Supplemental Security Income ("SSI") benefits.

[4] References denoted as "T" are to the transcript of the administrative record.

major depression, bipolar disorder, and herniated discs (T. 164). Her past relevant work was as a cashier in a grocery store, a clerk for the post office and a supervisor at a drugstore (T. 54, 165).[5] After her claim was denied, plaintiff filed a timely request for a hearing (T. 76-77). A hearing was conducted by Administrative Law Judge ("ALJ") Donald T. McDougall on January 10, 2014 (T. 41-59). Plaintiff was not represented by an attorney at the hearing, but was assisted by a Spanish interpreter (T. 46-47).[6] On April 23, 2014, ALJ McDougall determined that plaintiff was not disabled (T. 22-36). Plaintiff requested review by the Appeals Council, which was denied on September 21, 2015, making the ALJ's determination the final decision of the Acting Commissioner (T. 1-7). Plaintiff thereafter commenced this action.

## ANALYSIS

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

---

[5] Plaintiff moved to Buffalo, New York from Puerto Rico sometime in 2012 to "get away from[a] family problem" that they were experiencing in Puerto Rico (T. 598). She is unemployed and resides in Alden, New York with her husband and two of her children. Id.

[6] The record reflects that on her application for SSD benefits plaintiff stated that she cannot speak or understand English, she cannot read English, and she could write no more than her name in English (T. 163). At the administrative hearing, through an interpreter she testified that she understood a little English: "I can say a few words, but I won't say that I can speak" (T. 47).

It is well-settled that an adjudicator determining a claim for Social Security benefits employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. In this case, it is not disputed that: plaintiff is not currently engaged in substantial gainful activity; plaintiff's severe impairments do not meet or equal the listings in Appendix 1 of the regulations; and plaintiff cannot perform her past work. At issue here is whether ALJ McDougall properly considered plaintiff's mental impairment at step 2, and whether his determination, at step 5, that there is other work plaintiff can perform in light of the her residual functional capacity is supported by substantial evidence. The plaintiff bears the burden with respect to the step 2 determination (*see* Berry v. Schwieker, 675 F.2d 464, 467 (2d Cir. 1982), while the Acting Commissioner bears the burden at step 5. *See* Talavera v. Astrue, 697 F.3d 145 (2d Cir. 2012).

**B. ALJ McDougall's Determination**

ALJ McDougall determined that plaintiff suffered from severe impairments including osteoporosis and degenerative disc disease (T. 24).[7] He found that plaintiff's mental impairment was not severe (T. 25). He concluded that plaintiff retained the residual functional capacity "to perform the full range of light work . . . The claimant could occasionally lift 20 pounds and frequently lift 10 pounds. She could stand and/or walk (with normal breaks) for at least two hours in an eight hour day and sit (with normal breaks) about six hours in an eight hour day. The claimant could occasionally climb, balance, stoop, kneel, crouch and crawl. The claimant was only slightly limited in her ability to understand and carry out detailed or complex

---

[7] An MRI of plaintiff's lumbar spine taken on August 23, 2011 revealed a herniated disc at L5-S1 with compression of the dural sac and narrowing of the disc space and bulging annulus fibrosus, as well as degenerated discs at L4-L5 and L2-L3 each with bulging annulus fibrosus (T. 427).

instructions" (T. 29). ALJ McDougall then apparently applied Rule 202.21 of the Medical-Vocational Rules contained in Appendix 2 ["the Appendix 2 grid"] (20 C.F.R. Part 404, Subpart P), which states that a younger individual (age 45-49) capable of performing light work who was a high school graduate is considered "not disabled" (T. 35).[8]

Plaintiff argues that ALJ McDougall erred because he determined that plaintiff could communicate in English, and failed to develop the record as to the severity of her mental impairment and the limitations imposed by her language barrier. Plaintiff's Memorandum of Law [9-1], pp. 15-21.

ALJ McDougall's residual functional capacity assessment is not supported by substantial evidence for several reasons. Initially, it is well settled that light work requires the ability to stand and walk for up to six hours a day, and sit for up to two hours. Mancuso v. Astrue, 361 Fed. Appx. 176, 178 (2d Cir. 2010). By contrast, ALJ McDougall determined that plaintiff could stand and walk for two hours a day and sit for about six hours in a workday (T. 29). Such an assessment is not consistent with the ability to perform a full range of light work.

Further, although ALJ McDougall found that plaintiff's mental impairments were not "severe" at stage 2 of the sequential process, the record reflects that plaintiff had been treated for depression and anxiety from 2009 through the expiration of her insured status on June 30, 2013 (T. 392, 399, 459, 464, 597, 602), and thereafter. In a report dated December 14, 2009, Dr. Edelmiro Rodriguez stated that plaintiff became depressed upon the death of her mother five

---

[8] In his decision, ALJ McDougall does not cite to the specific rule in the Appendix 2 grid which he employed, but instead refers generally to "SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2". Id. The Acting Commissioner suggests that ALJ McDougall "relied on Guidelines Rule 201.21, which assumes a younger individual limited to *light work* with a high school education and an unskilled work history, and directs a finding of 'not disabled'". The Acting Commissioner's Memorandum of Law [12-1], p. 8 (emphasis added). However, Rule 201.21 relates to individuals who are capable only of sedentary work, not light work as determined by ALJ McDougall.

years earlier and that her condition had deteriorated since that time (T. 388). He noted that she could not afford to continue to receive psychiatric treatment. Id. On December 16, 2009, Dr. Isabel Cestero noted that starting in 2004 plaintiff had been prescribed Wellbutrin, Lexapro and Ambien for a depressive disorder, but was not taking the medication at that time because she did not have medical insurance (T. 395).

Upon a consultative examination, Dr. Susan Santarpia found that plaintiff's attention and concentration were "mildly impaired due to limited function, possibly lack of effort", and that her recent and remote memory skills were "impaired due to suspected lack of effort, possible difficulty with interpretation" (T. 457). She noted that plaintiff was still prescribed psychotropic medication based upon diagnoses of depression and bipolar disorder from a previous medical provider in Puerto Rico (T. 455). Dr. Santarpia diagnosed plaintiff as suffering from a depressive disorder and an anxiety disorder, and recommended that plaintiff be referred to individual psychological therapy and psychiatric intervention to start prescribing medication from New York as opposed to Puerto Rico (T. 458). Nevertheless, Dr. Santarpia concluded that plaintiff presented with "psychiatric problems" which "in and of itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis". Id.

Plaintiff claims that her depression worsened in 2013 (subsequent to the examination by Dr. Santarpia) [Plaintiff's Memorandum of Law [9-1], p. 21]. However, the Acting Commissioner asserts that "the evidence of record contains no documentation of significant mental symptomatology prior to the expiration of her Title II insured status on June 30, 2013". Acting Commissioner's Memorandum of Law [12-1], p. 9. To the contrary, a report dated June 4, 2013 from Nurse Practitioner AnneMarie Kenny at Lakeshore Behavioral Health

("Lakeshore") reflects that plaintiff's mental condition had deteriorated in 2013, prior to the expiration of her insured status[9] (T. 598). According to NP Kenny, plaintiff reported that for a period of time she had stable based upon a medication regimen including Effexor (150 mg), Seroquel, Klonopin, Ambien and Artane. Id. However, her new treating physician in Western New York had prescribed a lower dose of Effexor (75 mg) and Klonopin. Id. NP Kenny stated that plaintiff's current stressors included chronic mental illness, life transitions/relocating to Western New York from Puerto Rico, adjusting to current housing, financial strain, barrier to communication "as the patient only speaks Spanish and . . . has a limited support network". Id. With respect to current symptomology, NP Kenny stated:

> "The [patient] reports that her mood has been sad and depressed. The [patient] experiences periods of crying, has feelings of guilt, worthlessness and helplessness. The [patient] reports that at times when her mood is really depressed that she will have fleeting suicidal ideation and thoughts of wanting to disappear. . . The [patient] reports that her sleep has been terrible since not having Ambien IR, she will experience 4 to 5 days without sleep. The [patient] reports that she has felt better in the past and when stable on her medications. The [patient] reports that her energy is low, has symptoms related to anhedonia[10] and low motivation. The [patient] reports that her appetite is better. The [patient] reports that her concentration is poor, has periods of distractibility. The [patient] has some features of hypomania[11] and was told by her psychiatrist that she may have a Bipolar Disorder. The [patient] reports that her mood fluctuates and is labile. The [patient] has features of Generalized Anxiety, has a 20 year history of panic attacks, has features of agoraphobia and does not drive a car." Id.

---

[9] The record indicates that plaintiff started treatment at Lakeshore in March of 2013 (T. 615). She continued treatment there after the expiration of her insured status. Treatment notes suggest that her mental status fluctuated. On July 29, 2013 it was noted that her depression, mood and anxiety were "stable" (T. 618); on October 15, 2013 her mood was "mildly anxious and depressed" (T. 620); and on January 9, 2014 her "mood was depressed" (T. 622).

[10] "Anhedonia" is "total loss of feeling of pleasure in acts that normally give pleasure". Laracuente v. Colvin, 212 F. Supp. 3d 451, 454 (S.D.N.Y. 2016), *citing* Dorland's Illustrated Medical Dictionary at 91 (32nd ed. 2012).

[11] According to Stedman's Medical Dictionary (28th Edition, 2006), hypomania is a mild degree of mania, which is defined as referring to the phrase "manic-depressive" or pertaining to a manic-depressive psychosis (bipolar disorder).

NP Kenny assessed plaintiff's Global Assessment of Functioning (GAF") to be 55 (T. 601). The GAF scale found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, states that a score between 51 and 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)". DSM-4, p. 34. ALJ McDougall summarily dismissed GAF scores as being "subjectively assessed scores" which "reveal only snapshots of behavior" (T. 27), without otherwise discussing how this particular assessment was consistent (or inconsistent) with the findings of NP Kenny or plaintiff's other medical providers. While a GAF score does represent a "snapshot" assessment of plaintiff's condition, the same is true of consultative reports such as that by Dr. Santarpia.[12]

In any event, the determination of whether or not an impairment is severe at step 2 of the sequential evaluation process is intended only to screen out *de minimus* claims. Dixon v. Shalala, 54 F.3d 1019, 1030-31 (2d Cir.1995); Wilson v. Colvin, 2015 WL 1003933, *19 (W.D.N.Y. 2015). Thus, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality . . . [with] no more than a minimal effect on an individual's ability to work'". Rosario v. Apfel, 1999 WL 294727, *5 (E.D.N.Y. 1999) (*quoting* SSR 85–28, 1985 WL 56856, *3 (1985)).[13] The long-term prescription of medications such as Effexor,

---

[12]   *See* Popper v. Colvin, 2016 WL 922011, *5 (S.D. Ohio 2016), report and recommendation adopted *sub nom*. Popper v. Commissioner of Social Security, 2016 WL 2622313 (S.D. Ohio 2016) ("all consultative examinations, whether psychological or physical, provide a 'snapshot' look at a claimant's condition; if that were a proper basis for rejecting those opinions, it would apply in every case").

[13]   Although the claimant bears the burden of proof as to the first four steps, step two's "severity" requirement is *de minimus*, meant only to screen out the weakest of claims. Dilorenzo v. Colvin, 2017 WL 2590147, *2 (W.D.N.Y. 2017).

Seroquel, Wellbutrin, and Klonopin, along with the various reported symptoms experienced by plaintiff (i.e. depression, periods of crying, suicidal ideation, panic attacks, inability to sleep, low motivation, and hypomania), appear to suggest that plaintiff's mental impairment would have some impact upon her ability to work. In addition, while a GAF score of 55 is not solely determinative on the question of whether an impairment is "severe" at stage 2, it is evidence that should be considered. As discussed in Hickman v. Colvin, 2014 WL 652545, *6 (E.D.N.C. 2014):

> "Moreover, the ALJ interprets the GAF score of 55 as affirmatively showing that plaintiffs' mental impairments are non-severe. . . . A GAF score of 55 indicates moderate symptoms or moderate difficulty in social or occupational functioning. DSM–IV–TSR 34. . . . Thus, standing by itself, without consideration of other evidence, the score of 55 at least suggests that an impairment is severe. *See, e.g.,* Gonzalez v. Colvin, 2013 WL 2285101, *5 (M.D. Fla. 2013) (holding that a GAF of 55 "reflects a moderate mental limitation and would indicate a severe mental impairment"); Bennett v. Barnhart, 264 F.Supp.2d 238, 255 (W.D.Pa.2003) (holding that a GAF score of 55 to 60 suggests that a mental impairment is severe in nature). It therefore appears that the ALJ may have misapprehended the GAF score of 55."

Absent a rebuttal of the symptomology, findings and diagnoses contained in the reports of Dr. Rodriguez, Dr. Cestero, NP Kenny, and even Dr. Santarpia, which ALJ McDougall does not provide in his decision, the record does not support a *de minimus* finding with respect to plaintiff's mental impairments at step 2 of the sequential process. A remand for proper consideration of plaintiff's mental impairment is necessary.

ALJ McDougall's determination that plaintiff is able to communicate in English (T. 35) is also contrary to the evidence in the record. Plaintiff's application states that she is unable to read, write or speak English (T. 163). She required an interpreter at the administrative hearing (T. 47). At the hearing, plaintiff affirmed the fact that she could not speak English. Id. Various medical documents (T. 540, 577, 598), including the consultative report by Dr.

Santarpia, reflect that plaintiff is "Spanish speaking only" (T. 455). ALJ McDougall cited no evidence whatsoever to support his determination that plaintiff could communicate in English.

The Acting Commissioner argues that any error by ALJ McDougall with respect to plaintiff's language abilities was "not consequential" because the application of the Appendix 2 grid would result in a finding of "not disabled" even if plaintiff is considered "illiterate or unable to communicate in English". Acting Commissioner's Memorandum of Law [12-1], p. 8. However, if plaintiff's mental impairments constitute a significant nonexertional impairment rendering the application of the Appendix 2 grid inapplicable,[14] plaintiff's inability to speak English would have required testimony from a vocational expert to determine whether her language difficulties would preclude her ability to perform jobs existing in the national economy. Kotok v. Berryhill, 2017 WL 2859507, *3 (W.D. Wash. 2017) (the failure of ALJ or vocational expert to address how communication limitations would impact plaintiff's ability to find and perform jobs was an error requiring remand). Remand is required here to determine whether plaintiff suffered from significant nonexertional impairments rendering the Appendix 2 grid inapplicable, and if so, whether plaintiff's communication limitations would impact her ability to find and perform jobs otherwise within her residual functional capacity.

Finally, plaintiff also argues that ALJ McDougall failed to properly develop the record in light of her *pro se* status and language barrier. Plaintiff's Memorandum of Law [9-1], pp.18-24. At the hearing, plaintiff was worried that ALJ McDougall did not have all of her

---

[14] The mere existence of a nonexertional impairment does not preclude application of the Appendix 2 grid. Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir.1986). However, if plaintiff suffers from a significant nonexertional impairment that has a more than negligible impact on her ability to perform a full range of work, the Appendix 2 grid is inapplicable and the ALJ instead must obtain the testimony of a vocational expert. Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013).

medical records (T. 45). ALJ McDougall advised plaintiff that she was entitled to be represented by an attorney and that the hearing could be adjourned if she wanted to get an attorney (who could get her outstanding medical records). Id. Through her interpreter, plaintiff stated as "a compromise" that she would proceed with the hearing if ALJ McDougall would "write to the doctors to get that new information" (T. 46).

"Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments *both for and against* granting benefits". Sims v. Apfel, 530 U.S. 103, 110–11, (2000) (emphasis added). "This duty is present even when a claimant is represented by counsel . . . but it is heightened when a claimant proceeds *pro se*". Atkinson v. Barnhart, 87 F. App'x 766, 768 (2d Cir. 2004). "When the ALJ fails to develop the record fully, he does not fulfill this duty and the claimant is deprived of a fair hearing". Lopez v. Secretary of Department of Health & Human Services, 728 F.2d 148, 149 (2d Cir. 1984). "When a claimant is both unrepresented *and* suffers from a mental impairment ... the ALJ's duty to carefully develop the record is even greater". Thompson v. Sullivan, 933 F.2d 581, 586 (7th Cir. 1991).

Plaintiff argues that ALJ McDougall should have further developed the record with respect to plaintiff's mental impairment (Plaintiff's Memorandum of Law [9-1], p. 19, 21) and should have contacted her treating physician for a residual functional capacity assessment. (Id., p. 22). It is not clear from the record whether ALJ McDougall obtained all of the information plaintiff was concerned about when she made the agreement to proceed with the hearing without an attorney. Plaintiff argues that ALJ McDougall only made requests to obtain additional records from her medical providers after the administrative hearing, which meant that he did not question plaintiff with respect to "the overwhelming bulk of the relevant medical

- 10 -

records on her claim". Plaintiff's Memorandum of Law [9-1], p. 21. The Acting Commissioner does not respond to this argument. Plaintiff also claims that ALJ McDougall failed to have some of plaintiff's letters to the administrative agency translated from Spanish into English, and therefore was not aware of her concerns. Id., p. 20. The Acting Commissioner also fails to respond to this claim.

Contrary to the Acting Commissioner's claim, there is evidence in the record that plaintiff's mental status deteriorated in 2013 prior to the expiration of her insured status. The record should have been further developed to determine the extent to which plaintiff's mental impairment affected her ability to perform work on a sustained basis. I have recommended that this matter be remanded for a proper determination of plaintiff's residual functional capacity (inasmuch as ALJ McDougall's assessment that plaintiff could perform light work is not supported by the physical limitations he adopted), and for a more thorough consideration of the severity of plaintiff's mental impairment (and whether application of the Appendix 2 grid is appropriate in this case). At the same time, to the extent possible the record in this case should be further developed as to the limitations imposed by plaintiff's physical[15] and mental impairment prior to the expiration of her insured status.

---

[15] Citing Tankisi v. Commissioner of Social Security, 521 F. App'x 29, 33 (2d Cir. 2013), plaintiff seeks to have a residual functional capacity assessment obtained from her treating physician. Plaintiff's Memorandum of Law [9-1], p. 22. The applicable regulations provide that the adjudicator "will request a medical source statement about what you can still do despite your impairment(s)" 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). In Tankisi, the Court noted that the regulation goes on to state that "the lack of the medical source statement will not make the report incomplete". There, the Court held that where an ALJ fails to obtain a residual functional capacity assessment from a medical source, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity". Id. at 34. It is not apparent that the record in this case is as extensive as in Tankisi. Inasmuch as this matter is remanded for further proceedings on other grounds, and to ensure that the Acting Commissioner has a fully developed record upon which to reassess plaintiff's functional limitations, a

**CONCLUSION**

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [9] be granted to the extent that this case be remanded for further administrative proceedings; and that the Acting Commissioner's motion for judgement on the pleadings [12] be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by September 28, 2017. Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

---

report regarding plaintiff's residual functional capacity (at the time of her insured status) should be obtained, if possible, from plaintiff's treating physician.

arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: September 14, 2017

/s/ Jeremiah J. McCarthy  
JEREMIAH J. MCCARTHY  
United States Magistrate Judge